292 N.J. Super. 476 (1996)
679 A.2d 166
CHARLES STRNAD, JR., AND MARY ANN BAECHLER, PLAINTIFFS-APPELLANTS
v.
THE NORTH RIVER INSURANCE COMPANY, A/K/A CRUM & FORSTER COMMERCIAL INSURANCE, DEFENDANT-RESPONDENT. ARLINGTON DROP FORGE CO., INC., AND STUB ENDS, INC., PLAINTIFFS-APPELLANTS,
v.
THE NORTH RIVER INSURANCE COMPANY, A/K/A CRUM & FORSTER COMMERCIAL INSURANCE, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 15, 1996.
Decided July 22, 1996.
*478 Before Judges SHEBELL, STERN and NEWMAN.
Robert Susser argued the cause for appellants (Mr. Susser, attorney and of counsel; Russell J. Malta, on the brief).
Janet L. Poletto argued the cause for respondent (Bumgardner, Hardin & Ellis, attorneys; Ms. Poletto, of counsel, and on the brief; Marybeth Scriven, on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
Plaintiffs Charles Strnad, Jr., and Mary Ann Baechler, brought an action against North River Insurance Company (also known as Crum & Forster Commercial Insurance) (defendant) seeking a declaration of insurance coverage for the costs of remediating environmental contamination at a property previously owned by them. At the same time, plaintiff, Arlington Drop Forge Co., Inc. (Arlington), the company previously owned by Strnad and Baechler, and plaintiff Stub Ends, Inc. (Stub Ends), the concern that purchased the Strnad and Baechler stock in Arlington, filed their action against defendant seeking the same relief as Strnad and Baechler (all plaintiffs are referred to herein as "plaintiffs"). The two actions were consolidated on April 8, 1993. On April 22, 1994, defendant filed a motion for summary judgment, and plaintiffs cross-moved for summary judgment. On September 16, 1994, the Law Division judge issued its opinion granting defendant summary judgment. Plaintiffs appeal.
Arlington was a family-run button manufacturing business prior to World War II. During the war the business was converted to *479 metal forging, and the Wall Township site, the subject of this appeal, was purchased by it in 1963. Strnad and Baechler, a brother and sister, ran the company and, by 1982, owned all of the shares. Over the years, oil was used as "part of the metal machinging [sic] process" with metal shaving or chip by-products retaining oil residue. For a few years following the 1963 purchase of the site, Arlington "temporarily" stored these metal chips in piles directly on the ground until it had collected sufficient amounts to sell as scrap. Thereafter it stored the chips in dumpsters provided by scrap dealers. The company also used oil to power its hydraulic presses, and had a 6000-gallon heating oil tank on the premises. It used no solvents or chemicals such as trichlorethylene in its processes. At the rear of the property there was a "low area", and the company filled in this depression with such materials as bricks, empty drums, scalings and broken macadam. There was a gasoline tank on the property, but Arlington never used it.
In December 1982 Strnad and Baechler contracted to sell their Arlington shares to Stub Ends. The sale was consummated in 1983, and Stub Ends continued operating the business. Approximately a year later, it entered into a contract with Monmouth County Distributors to sell the premises. The contract required that Stub Ends obtain a negative declaration letter from DEP. Stub Ends was permitted to transfer the property to Monmouth County Distributors prior to resolution of the cleanup issues, but only after posting a letter of credit.
DEP required Stub Ends to obtain an environmental audit before it would issue any approvals under the Environmental Cleanup and Responsibility Act (ECRA) (N.J.S.A. 13:1K-6 to -13) (now known as the Industrial Site Recovery Act (ISRA)). Stub Ends retained Dan Raviv Associates, Inc. (DRAI) for this purpose. DRAI first issued its report and cleanup plan in September 1985, and revised it in June 1986 and May 1987. Each noted various areas of environmental concern. Among the causes listed for the contamination were "[d]isposal of leftover macadam," "[s]pill of *480 [fuel] oil," residual fuel and "metal working oil," and a "1000-gallon, underground, gasoline storage tank and associated soils." The contamination located around the gasoline tank led to the removal of the tank and to the testing of the groundwater beneath the site. Contaminated soils were to be excavated and replaced.
Results of the groundwater testing indicated that the wells adjacent to the gasoline tank had significantly lower levels of VOCs (volatile organic compounds) than did the upgradient wells. "An upgradient source of solvent contamination was suspected." After further testing, DRAI concluded that "two sources of ground water contamination exist in the vicinity of the ... site," one off-site, one "probably" on-site. The on-site groundwater-related contamination levels were less than 100 parts per billion (ppb). DRAI proposed cleanup of the groundwater, and continued testing.
In July 1990 DRAI submitted its final report and request to DEP for a full compliance determination. Based on the results of the additional testing, DRAI concluded that the groundwater VOCs possibly caused by activities at the site had acceptably decreased, and that
VOCs detected elsewhere on site are ... from an upgradient, off-site source of contamination. The on-site concentrations attributable to Arlington do not warrant a ground water cleanup.
On December 31, 1991, DEP issued a full compliance letter permitting the monitoring wells at the site to be sealed.
According to plaintiffs, the cleanup costs eventually exceeded $330,000 to meet DEP requirements.
Between 1974 and 1984 defendant provided both primary and excess comprehensive liability insurance to Arlington. With respect to property damage liability, the policies agreed to indemnify the insured "[f]or damages because of injury to or destruction of tangible property including consequential loss resulting therefrom, caused by an occurrence." Both the comprehensive general liability (CGL) policies and comprehensive catastrophe liability policies contained exclusions for damage to "property owned by" *481 the insured. Some of the policies expressly excluded property damage to "property used by the insured" or "property in the care, custody or control of the insured." The policies also had exclusions for property damage "to premises alienated by the named insured arising out of such premises or any part thereof."
In addition, certain of the policies had exclusions for bodily injury or property damage "arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land ... or any water course or body of water," but the exclusions did not apply if the discharge was "sudden and accidental." At least one policy expressly excluded "liability for contamination or pollution of land, water, air or real or personal property or any injuries or damages resulting therefrom caused by an occurrence." "Occurrence" generally meant "either an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period."
The only potential cause of the contamination at the site referred to in the Law Division judge's opinion was the metal chips or shards stored on the site. He concluded that the proofs indicated that the only "damage" to have occurred was to "the subject property," and that the holding in State, Dep't of Envtl. Protec. v. Signo Trading Int'l, Inc., 130 N.J. 51, 612 A.2d 932 (1992), as respected damage to the insured's own property, was unaffected by the subsequent decision in Morton Int'l, Inc. v. General Acc. Ins. Co. of Am., 134 N.J. 1, 629 A.2d 831 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994). He concluded the "owned property" exclusion, therefore, did apply. He noted, however, that defendant's contention that the pollution was intentionally discharged could not be decided as a matter of law and if he erred with respect to the owned property exclusion, plaintiffs would be entitled to a trial.
*482 We find that the expenses of monitoring the site's groundwater were "damages" under the policies, based upon the Morton Court's reference to "environmental-response costs" as "damages" under the typical CGL policy. 134 N.J. at 27, 629 A.2d 831. We further hold that groundwater is not "owned property" and damage to it is not precluded by the policies' exclusions. We held in Morrone v. Harleysville Mut. Ins. Co., 283 N.J. Super. 411, 419-20, 662 A.2d 562 (App.Div. 1995), and in several cases decided today, that for purposes of a CGL policy, groundwater should not be considered property "owned by" the insured. The same policy language as in the other appeals decided today is also present here. In Reliance Ins. Co. v. Armstrong World Indus., 292 N.J. Super. 365, 678 A.2d 1152 (App.Div. 1996), we also held that groundwater contamination is not excluded by the "use" and "care, custody or control" exclusions of CGL policies. Therefore, it follows that the costs of investigating the condition of groundwater in order to determine whether it required remediation would also be covered as damages.
We note, however, that even if the costs of investigating and monitoring groundwater are considered "damages" and therefore covered expenses under the policies, the other costs associated with remediating the site  for example soil excavation, and fill and tank removal  should not be considered covered damages except to the extent that such expenses were deemed costs reasonably associated with groundwater remediation. The soil and tanks were clearly "owned property." See State v. Signo, supra, 130 N.J. at 63, 612 A.2d 932.[1] Therefore, despite our holding that groundwater is not "owned property" for purposes of a CGL policy, we must remand for a determination of the particular groundwater-related environmental expenses encountered, as opposed to site remediation expenses generally. On this record *483 we cannot be certain as to what cleanup costs were the result of soil pollution unrelated to any groundwater contamination.
The fact that, at least according to plaintiffs' environmental consultant, some of the groundwater pollution beneath the site was caused by off-site activities does not affect our determination as to the applicability of coverage. The owned property exclusions concern plaintiffs' relationship to property claimed to be damaged by them and not whether plaintiffs actually created the damage. As we have noted, several policies have either the more recent "pollution exclusions" or the earlier exclusions against liability from releases or discharges of contaminants. The parties do not address their applicability and we do not consider these issues at this time.
Reversed and remanded.
Judge Stern concurs for the reasons expressed in his concurring opinion in Reliance Ins. Co. v. Armstrong World Indus., 292 N.J. Super. 365, 678 A.2d 1152 (App.Div. 1996).
NOTES
[1] See, however, our comment in Kentopp v. Franklin Mutual Ins. Co., 293 N.J. Super. 66, 77-78, 679 A.2d 701 (App.Div. 1996).