725 A.2d 76 (1999)
319 N.J. Super. 223
UNIVERSAL-RUNDLE CORPORATION, Plaintiff-Respondent/Cross-Appellant,
v.
COMMERCIAL UNION INSURANCE COMPANY, Defendant-Appellant/Cross-Respondent, and
American Motorists Insurance Company, Continental Insurance Company, Liberty Mutual Insurance Company, Maryland Casualty Company, National Surety Corporation, the Travelers Insurance Company and Zurich Insurance Company, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued December 15, 1998.
Decided March 12, 1999.
*78 Richard A. Ifft (Rosenman & Colin) of the D.C. Bar, admitted pro hac vice, for defendant-appellant/cross-respondent (Melli & Wright, Paramus, and Mr. Ifft, Washington, DC, attorneys; Mary E. Romano, Paramus, and Mr. Ifft, on the brief).
Carl A. Salisbury, East Hanover, for plaintiff-respondent/cross-appellant (Killian & Salisbury, and Tomar Simonoff Adourian O'Brien Kaplan Jacoby & Graziano, Cherry Hill, attorneys; Eugene Killian, Jr., Carl A. Salisbury, and Renee A. Rubino, East Hanover, on the brief).
Before Judges KEEFE, EICHEN, and COBURN.
*77 The opinion of the court was delivered by KEEFE, J.A.D.
Defendant, Commercial Union Insurance Company (Commercial), appeals from the entry of a final judgment declaring that Commercial had the obligation to defend and indemnify plaintiff, Universal-Rundle Corporation (Universal), in an action brought by Vineland Construction Company (Vineland) against Universal for cleanup costs resulting from the contamination of soil on property sold by Universal to Vineland. We affirm the judgment affording coverage to Universal by Commercial, but reverse as to certain collateral issues and remand for further proceedings.
Universal manufactured bathtubs, sinks, and lavatories at its Pennsauken site along the Delaware River between approximately 1929 and 1972. Universal discharged by-products and waste from its manufacturing process in an area between the manufacturing facility and the Delaware River. The area where Universal dumped its waste was swampy, although above the level of the river.
In 1973, Universal sold the site to Vineland. In 1979, the Department of Environmental Protection (DEP) granted Vineland permission to operate the site as a solid waste disposal facility. In 1989, the Camden County Municipal Utilities Authority discovered contaminated soil in groundwater on the site while installing a sewer line across the rear of the property. The DEP was informed of the findings.
In June 1992, Vineland sued Universal for compensatory and punitive damages in connection with the anticipated cleanup costs of the site. Vineland alleged that Universal had contaminated the property during its ownership. More specifically, Vineland alleged that Universal knew of the contamination prior to the sale and thereby defrauded Vineland, and that Universal was strictly liable to Vineland under relevant New Jersey environmental laws. Although Universal received *79 the Vineland complaint in July 1992, it did not contact Commercial until January 1993.
Commercial hired a Los Angeles attorney to investigate the site and plaintiff's operations. In October 1993, Commercial denied coverage on various grounds, including intentional contamination of the property, the fact that the contamination caused property damage only to the property itself and not to that of third parties, Commercial's lack of duty to pay damages sustained to property alienated by the insured to another, and Universal's failure to disclose contamination of the property to Commercial when it purchased the insurance from Commercial for the years 1980 through 1983. Other insurers of Universal during the relevant period also disclaimed coverage.
Universal ultimately settled with Vineland. As a result of the settlement, Universal obtained the right to interface with the appropriate government agencies with respect to the cleanup procedures. Universal's plan was to provide "an asphalt cap of the property rather than total groundwater remediation and total soil remediation." At the time Universal entered into the settlement agreement, it estimated the expected cleanup costs for the site to fall in the one to three million dollar range.
On July 22, 1994, Universal filed the complaint from which this appeal stems, seeking a declaratory judgment against Commercial and various other insurance companies. One of the allegations by Universal against all insurance company defendants was that they had denied its claim in bad faith. Ultimately, summary judgment was granted to the defendant insurers on the bad faith claim. Prior to trial, Universal settled with all insurance company defendants except Commercial. The dates and terms of those settlements are not a part of this record.
Between January 16, 1997, and March 21, 1997, this matter was tried to the court without a jury. The testimony revealed that Universal had two main processes: the iron foundry, which would fabricate the metal forms for the tubs, sinks, and lavatories, and the enameling unit, in which the castings were coated with one of two types of enamel. The waste products from the foundry were sand and slag, which constituted as much as ninety-five to ninety-eight percent of all the waste.
Much of the focus of the testimony, however, was on the waste created as a by-product of the enameling process. That waste, from whatever source, was estimated to be no more than two to five percent of the total waste generated by the plant. Only one of the two enameling processes utilized by Universal contained lead oxide and that process only constituted eight percent of the enamel. Both processes, however, contained antimony oxide. Although all of the witnesses testified that the manufacturing process did not require the use of arsenic in any form, minutes of a 1964 Universal Board of Directors meeting indicated the need to implement a dust collecting system in the factory in order to alleviate dangers from the use of lead and arsenic in the manufacturing process.
While all of plaintiff's ex-employees who testified acknowledged generally the danger to workers from breathing dust containing lead, none of them believed that the waste material was hazardous. For example, one-time plant manager David Cooke testified that the general impression during the time in question was that foundry sand and metal-making slag made excellent landfill. He considered the industrial waste to be "totally innocuous" because he believed it to be inert and insoluble and therefore incapable of contaminating "groundwater or things like that." Oren Dyre, the chief chemist, shared Cooke's opinion. There is no indication that any government agency ever notified Universal that discharging foundry waste deposited unacceptable contaminants in the soil or groundwater.
Both parties called expert witnesses. Doctor Roy Ball, an environmental engineer, testified on behalf of Universal. In summing up his conclusions concerning the data collected by borings at the site, Ball said:
The data show that the material does leach specific contaminants or hazardous substances. The place where that's going is the groundwater. There is groundwater contamination. The level at which they *80 leach is low, so low that EPA would not classify it as a hazardous waste. But we have soil [contamination] that is above New Jersey criteria for soil and we have contamination of the groundwater at the site.
Ball also acknowledged that as early as the 1950s engineering journals contained articles describing the public health hazards of such materials as antimony, lead, and arsenic in groundwater, and indicated that the "dumping of these sorts of materials in such a refuse dump near the groundwater, near a river, is a potential polluting problem...."
Dr. Ellen Silbergeld testified as an engineering expert on behalf of Commercial. Although she conceded that there was some doubt as to whether arsenic was present in any of Universal's factory waste, she said that lead and antimony were present in the material collected both in the ventilation systems and the foundry waste that was routinely deposited in the rear of the plant. She said that these materials were known pollutants at the time plaintiff was depositing them behind the plant and, contrary to Universal's employees' belief, they could not be classified as inert. Nonetheless, she acknowledged on cross-examination that there was no evidence that anyone from plaintiff's plant ever suffered from lead or arsenic poisoning as a result of operations, or that Universal ever knew that lead or antimony was leaching from its fill into the groundwater. Indeed, she acknowledged that as late as 1953 one of the accepted solutions for dumping such waste materials was to deposit them in the ocean so that they would not contaminate the groundwater, thus recognizing how much ideas about environmental pollution have changed since the time plaintiff's plant began operations.
Jack Wagner testified on behalf of Commercial as an expert in the enamels industry. He opined that Universal knew or should have known that the wastes resulting from the manufacturing process were pollutants. He acknowledged that the standard practice at the time was to remove such waste to a landfill because it was "good fill material" and had "good structural quality." Nonetheless, he said that it was ordinarily buried in "high areas or areas certainly where there was not [sic] water courses...."
The trial judge made extensive findings of fact from the testimony. He found that the credible evidence supported the conclusion that although Universal deposited "[h]undreds of tons" of material over the years behind the plant, such material only included "extremely small quantities of lead oxide, [and] antimony oxide...."[1] The judge also found that while Universal was aware of the dangers of antimony and lead insofar as dust exposure to workers was concerned, and took precautions in that context, that knowledge did not translate into knowledge that the waste was harmful to the groundwater. Moreover, he found that Universal's manner of disposal was "acceptable in the industry in the time frameunder consideration...." He found that the medical articles referred to by the experts that were extant at the time were not particularly relevant because there was no evidence that Universal was aware of them. The judge also noted that Universal had never received complaints from regulatory agencies concerning its waste practices. While acknowledging that Universal intended to take the waste to the back of the plant and dump it, the judge found that Universal's practice constituted the non-intentional discharge of a pollutant because Universal was simply unaware that the discharge of its factory waste was environmentally unacceptable. Thus, on balance, the judge found that Commercial failed to meet its burden of proving that the pollution-exclusion clause applied to Universal's practices in order to bar coverage.
The judge's findings of fact must be upheld on appeal when supported by adequate, substantial, and credible evidence. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). Given our standard of review, we are satisfied that there is no warrant for our interference. The real question, as we will point out in our discussion under Point I, is whether *81 Universal's subjective knowledge of the pollutant qualities of its waste material is a relevant consideration where the relevant insurance policies contain pollution-exclusion clauses.

I.
As noted earlier, between 1980 and 1983, Universal purchased identical comprehensive general liability (CGL) policies from Commercial with single liability limits for bodily injury and property damage of one million dollars per occurrence.
Under the terms of the policies,[2] defendant agreed that it would
pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury or ... property damage to which this policy applies, caused by an occurrence and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such property damage, even if any of the allegations of the suit are groundless, false or fraudulent....
"Property damage"[3] means
(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy year.
An "occurrence" was defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."
Among the coverage exclusions was a so-called "pollution-exclusion," that provided:
[t]his insurance does not apply ... (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
Other provisions excluded coverage "(k) to property damage to (1) property owned or occupied by or rented to the insured, (2) property used by the insured, or (3) property in the care, custody or control of the insured...." Still another exclusion barred coverage "(l) to property damage to premises alienated by the named insured arising out of such premises or any part thereof."
Commercial claims that the trial judge erred in determining that the policy's pollution-exclusion clause did not bar Universal's claims. Specifically, Commercial asserts that the judge misapplied the governing principles set forth in Morton Int'l, Inc. v. General Accident Ins. Co., 134 N.J. 1, 629 A.2d 831 (1993), cert. denied, 512 U.S. 1245, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994), in that the judge "collapsed the pollution-exclusion analysis into the `occurrence' analysis...."
We agree with Commercial that where there is a pollution-exclusion clause in a CGL policy, coverage cannot be afforded to the insured by simply finding there was an "occurrence" as that word has been interpreted by caselaw involving pollution claims. By overruling this court's decision in Broadwell Realty Servs., Inc. v. Fidelity & Casualty Co., 218 N.J.Super. 516, 528 A.2d 76 (App. Div.1987), the Morton Court made it clear that "the standard pollution-exclusion clause should [not] be understood merely to impose the same conditions on coverage as are imposed by the definition of `occurrence,' which focuses on whether the ultimate damage was expected or intended from the standpoint of the insured." Morton, supra, 134 N.J. at 28, 629 A.2d 831. Rather, the Court held:
[N]otwithstanding the literal terms of the standard pollution-exclusion clause, that *82 clause will be construed to provide coverage identical with that provided under the prior occurrence-based policy, except that the clause will be interpreted to preclude coverage in cases in which the insured intentionally discharges a known pollutant, irrespective of whether the resulting property damage was intended or expected.

[Id. at 78, 629 A.2d 831.]
By focusing the inquiry on the intentional discharge of a "known pollutant" rather than the insured's intention to damage the environment, the inclusion of a standard pollution-exclusion clause in a CGL policy has the effect of narrowing coverage. Id. at 30, 629 A.2d 831.
We believe that the Court's intention to afford coverage to an insured as if an occurrence-based policy was issued, with the significant proviso that the insured will not have coverage if it intentionally discharges a known pollutant, recognizes the insurance industry's desire to preclude coverage to "knowing polluters," while precluding the insurance industry from limiting coverage only to pollution resulting from so-called "`boom' event[s]." Id. at 34, 37, 629 A.2d 831.
Thus, an inquiry into whether there was an "occurrence" in the context of the facts of a given case remains relevant even where there is a pollution-exclusion clause. Indeed, the Morton Court said: "[T]he ultimate issue remaining to be addressed is whether the events resulting in the property damage ordered to be remediated ... constitute an ... `occurrence' as defined in the various CGL policies." Id. at 80, 629 A.2d 831. However, in such cases, the question is not whether the insured intended to cause damage as a result of intentionally discharging known pollutants, as under a pure occurrence policy, but whether the insured's purposeful discharge of waste was accompanied by knowledge that the waste included a "known pollutant." Id. at 78, 629 A.2d 831.
An insured cannot "knowingly pollute" if it does not realize that the discharged waste contains pollutants. This interpretation gives meaning to both the concept of "occurrence" and the Court's statement that there must be an intentional discharge of a "known pollutant." Id. at 78, 629 A.2d 831.
To state it somewhat differently, if the Morton Court believed the insured's knowledge concerning the pollutant nature of the discharge was irrelevant, it would have simply interpreted the pollution-exclusion clause to bar coverage where the insured intentionally discharged a pollutant, leaving out the modifier "known." Thus, because the act of discharging a pollutant, standing alone, is all that is required under a literal interpretation of the standard pollution-exclusion clause, an interpretation that the Morton Court eschewed, the Court's incorporation of the phrase "intentionally discharges a known pollutant" and the concept of an "occurrence" in the context of the standard pollution-exclusion clause perforce requires an examination of the subjective knowledge and intent of the insured. We believe our interpretation of the Court's language accomplishes the desired goal of precluding insurance coverage to those who discharge known pollutants.
An inquiry into the insured's knowledge and intent is necessarily fact sensitive. As the Morton Court recognized, ascertaining subjective intent is elusive. Id. at 85-86, 629 A.2d 831. There are, however, inferences stemming from an insured's objective behavior that help shed light on the insured's intent, such as,
the duration of the discharges, whether the discharges occurred intentionally, negligently, or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm.
[Id. at 86-87, 629 A.2d 831 (emphasis added).]
These factors are as relevant to an inquiry of an insured's subjective intent to discharge a known pollutant as they are to an insured's subjective intent to injure.
The trial judge analyzed the evidence in the context of these factors. Although the judge occasionally confused the distinction between intent to discharge a known pollutant and intent to injure, he recognized the *83 need to determine Universal's knowledge of the polluting qualities of its waste as distinguished from its intent to discharge. Thus, he found: "[T]he company had no knowledge the waste was unacceptable, or that they were discharging a known pollutant in a form which would create a problem." He also found that
no one ever contemplated what damage could be done by the disposal of what everyone believed to be innocuous waste materials, or materials that may not have been innocuous, but because they were contained in such voluminous quantities of sand and ash and things that were totally harmless, that they would then not be injurious in any way, shape or form.
In arriving at those conclusions, the judge gave reasons based on the evidence and pointed to Commercial's own investigator's testimony to the effect that Universal did not know of the contamination of the site until it received the Vineland complaint. As we said earlier, the judge's findings were supported by evidence in the record after affording him due deference in his unique ability to assess the credibility of the various witnesses who testified.[4]Rova Farms, supra, 65 N.J. at 484, 323 A.2d 495.
In the present case, concededly, plaintiff's "discharging" was a routine or regular part of its operation, was ongoing for perhaps forty-five years, and was intentional. Morton, supra, 134 N.J. at 86-87, 629 A.2d 831. Nevertheless, no evidence suggested that plaintiff was in fact aware at the time that its dumping of slag, sand, and dust behind its plant, with whatever amount of lead or antimony was contained in such materials, could be harmful to either people or the environment. In fact, defendant's expert conceded that plaintiff did not know that either lead or antimony was leaching from the waste deposits into the groundwater. Similarly, there was no evidence that there had been any regulatory investigations, warnings, or notices concerning the operation or dumping practices throughout the period.
Universal's practices pale in comparison to those in Morton, supra, where the Court concluded that the insured knew it was discharging a contaminant into the water. For example, in that case the insured had continually discharged harmful organic and inorganic mercury compounds into a nearby creek for approximately twenty years notwithstanding notice by state regulatory officials as well as its own consultants that its emissions were unacceptable for discharge in that manner. Morton, supra, 134 N.J. at 87-88, 629 A.2d 831. Moreover, after promising to implement treatment facilities for its effluent, the insured "disregarded its commitment" for an additional six years until the EPA became involved. Id. at 88, 629 A.2d 831. Thus, the Court held that irrespective of whether Morton's predecessors' "intended or expected environmental damage, [ ] they had intentionally discharged known pollutants into Berry's Creek for approximately twenty years ...." and were not entitled to insurance coverage. Id. at 87, 629 A.2d 831.
Commercial likens the circumstances here to Ogden Corp. v. Travelers Indemn. Co., 924 F.2d 39 (2d Cir.1991), a case referred to in Morton. In Ogden, the Second Circuit Court of Appeals upheld a grant of summary judgment to the insurers against the lessees of a commercial property on the ground that the lessees's continuous contamination of the property between 1950 and 1983 could not be considered "sudden and accidental" and therefore as falling within the pollution-exclusion exception. Ogden, supra, 924 F.2d at 41-42.
The Morton Court cited Ogden, however, only as an example of the proposition that there is "a tendency on the part of courts to construe `sudden' most restrictively in cases in which insureds have discharged known pollutants intentionally and on a regular and continuous basis over many years...." Morton, supra, 134 N.J. at 70, 629 A.2d 831. Thus, Commercial errs in claiming that "Ogden is thus a case where the Morton Court felt the pollution exclusion was properly *84 found to bar coverage because the insured had `intentionally discharged a known pollutant' (lead) over a protracted period of time." In fact, Morton did not "approve" Ogden. Rather, the Court ultimately decided to eschew reliance on various interpretations of "sudden" in favor of reading the pollution-exclusion clause to preclude coverage only where "the insured intentionally discharges a known pollutant...." Id. at 78, 629 A.2d 831.

II.
Defendant claims that the trial court erred in dismissing its defense under the policy's owned property exclusion.[5] Specifically, it argues that the evidence established how most of the material deposited at the site was discharged into plaintiff's own soil which, unlike groundwater, is considered "owned property" of the insured. In fact, "on-site soil contamination was a significant ... focus of the underlying Vineland action," and thus the trial court should have made allocation determinations as to what percentage of the remediation costs were attributable to the soil contamination as opposed to contamination of groundwater or other waters.
This court has determined "that for purposes of a CGL policy, groundwater should not be considered property `owned by' the insured." Strnad v. North River Ins. Co., 292 N.J.Super. 476, 482, 679 A.2d 166 (App. Div.1996); see also Adron, Inc. v. Home Ins. Co., 292 N.J.Super. 463, 474, 679 A.2d 160 (App.Div.1996); Reliance Ins. Co. v. Armstrong World Indus., Inc., 292 N.J.Super. 365, 385, 678 A.2d 1152 (App.Div.1996); Morrone v. Harleysville Mut. Ins. Co., 283 N.J.Super. 411, 419-20, 662 A.2d 562 (App. Div.1995). In Strnad, supra, the court addressed whether CGL coverage extended to the costs of soil and groundwater remediation caused by a leaking underground gasoline tank on the insured's property. 292 N.J.Super. at 479-80, 679 A.2d 166. Pointing out how our Supreme Court had previously determined in State v. Signo Trading Int'l, Inc., 130 N.J. 51, 63, 612 A.2d 932 (1992), that any contaminated soil on site was clearly "owned property" for purposes of a CGL policy, the Strnad court proceeded to address the allocation question concerning whether soil remediation costs necessary in order to correct the causes of groundwater contamination were to be in whole or part covered under the policies:
We note, however, that even if the costs of investigating and monitoring groundwater are considered "damages" and therefore covered expenses under the policies, the other costs associated with remediating the sitefor example soil excavation, and fill and tank removalshould not be considered covered damages except to the extent that such expenses were deemed costs reasonably associated with groundwater remediation. The soil and tanks were clearly "owned property." (citations omitted). Therefore, despite our holding that groundwater is not "owned property" for purposes of a CGL policy, we must remand for a determination of the particular groundwater-related environmental expenses encountered, as opposed to site remediation expenses generally. On this record we cannot be certain as to what cleanup costs were the result of soil pollution unrelated to any groundwater contamination.
[Strnad, supra, 292 N.J.Super. at 482-83, 679 A.2d 166; see also, Signo, supra, 130 N.J. at 65, 612 A.2d 932 (where the Supreme Court affirmed our reversal of judgment for an insured, agreeing with us that the "owned property" exclusion was a valid bar to coverage where there was no evidence that "`there was migration of the chemical pollutants off the [insured's] property ... into any of the waters of the state.'") (citation omitted).]
In its complaint, Universal alleged coverage for pollution damage to both "surface and sub-surface soils" and "surface and groundwaters," as well as to "natural resources, at and around the Pennsauken site." Commercial conceded at trial that there was *85 evidence of both soil and groundwater contamination. Indeed, the evidence so indicates. Thus, Commercial had a legitimate claim that amounts expended exclusively to remediate soil at the site would not be covered expenses based on the owned property or alienated property exclusions. Strnad, supra, 292 N.J.Super. at 482-83, 679 A.2d 166; see also Marsh v. New Jersey Dep't of Envtl. Protection, 152 N.J. 137, 150, 703 A.2d 927 (1997) (where the Court concluded that there was no "de minimis exception" to application of New Jersey environmental statutes holding polluters strictly liable for contamination cleanup).
During the trial, however, no evidence on actual or planned allocation of remediation expenses between soil cleanup and groundwater cleanup was presented. Moreover, while evidence was presented below as to the estimated total remediation costs and the general differences between the methods of remediation favored by Commercial as opposed to those suggested by Vineland, particular evidence as to specific means of cleanup was not introduced. Evidently, the true cleanup costs were unknown because the remediation plan had not been finalizeda common occurrence in declaratory judgment actions. Thus, Commercial's failure to address this issue in the trial court on the merits was reasonable. Commercial raised the issue below and evidently attempted to preserve it, but the trial judge ruled against it.
In that respect, we believe the trial judge erred. It may be that the overwhelming expense of remediation has nothing to do with groundwater cleanup, and under such circumstances it would be unfair to saddle Commercial with all soil cleanup costs.
Neither the trial judge nor Universal ever expressed that by not pursuing this issue fully Commercial was waiving it. Rather, the judge's impression, at least partially mistaken, was that by "having made four references in [defendant's] own [trial brief] to the damage to the property of others," Commercial was necessarily conceding that all remediation costs would be covered under the policies. On remand, Commercial shall be permitted to present evidence of the proper allocation of remediation expenses between soil and groundwater cleanup.

III.
Commercial complains that the trial judge erred in apportioning its coverage liability, and especially in holding it completely responsible for the defense costs of the Vineland action.
As to the counsel fees issue, the trial judge concluded that Commercial had no right to refuse to defend plaintiff in the Vineland action because there had been an "occurrence" under the terms of the policy and because the pollution-exclusion clause was inapplicable. Moreover, the allegations in the Vineland complaint contained "covered claims," and therefore "a defense should have been proposed or offered." According to the judge, there were $749,135.25 in total defense fees engendered by the Vineland action. Of that amount, $76,777.50 were for matters undertaken by way of counsel fees prior to Universal's having informed Commercial of the Vineland matter. Another $12,235.63 were for matters undertaken relevant to the Vineland fraud claim, that is, Vineland's assertion that Universal had withheld information from it about the pollution at the time plaintiff sold it the property. Permitting Commercial credits for those two amounts the fees incurred prior to giving notice and those incurred on account of the fraud allegations, the judge thus determined that the amount of counsel fees at issue was $660,122.14 ($749,135.25$76,777.50$12,235.63 = 660,122.14).
As for Commercial's assertion that whatever the proper net fees Universal reasonably encountered, Commercial could only lawfully be held responsible for 3.41% thereof, the judge called such an argument "unconscionable."[6] Although the judge recognized the *86 Supreme Court's instruction from Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437, 650 A.2d 974 (1994), to the effect that a model or formula be applied in environmental cases whereby coverage and defense costs are allocated by time on the risk and degree of risk assumed, he nonetheless concluded that this was not the type of case the Court had in mind for application of such a measure. The trial judge reasoned that his determination did not create a windfall to Universal because in the various settlements Universal had earlier effected with the other insurance carriers, no amounts had been set aside for counsel fees or defense costs, and the judge had directed all settlement amounts to be deposited in an income-paying account to be used to cover the costs of remediation.[7]
As far as Commercial's share of remediation costs was concerned, however, the trial judge did not know the amounts of the settlements at that time. But whatever they were, he held that they would have to be exhausted before Commercial would be obligated to pay anything for cleanup. Thus, Commercial would only be required to pay remediation costs in excess of the total settlements and only to the extent of its policy limits. Within those strictures, however, Commercial could foreseeably in fact have to pay its limits.
While the judge was clear that he wanted the proposed form of order to reflect the finality of his rulings, he believed that his decision, coupled with the unknown total remediation costs, could create a potential problem should defendant later wish to challenge its Owens-Illinois coverage obligations in the event that it ended up paying the full extent of its policy limits and it deemed that amount proportionally unfair given the other insurers' settlements, which amounts were then unknown to the court and, presumably, to Commercial. Thus, the judgment under review in relevant part provided:
5. Commercial Union must commence a new proceeding, pursuant to Owens ... which proceeding is to be based upon the facts and evidence adduced at trial of this matter, if Commercial Union is called upon in the future to pay cleanup costs in excess of what it contends is its allocated share of such costs....
In Owens-Illinois, supra, the Court addressed the continuous-trigger principle as it affected both duty to defend and coverage liability in the increasingly complex area of environmental pollution cases. The Court determined that the proper method to resolve such disputes would be "proration by time and degree of risk assumed ...." with reference to such circumstances as "how primary and excess coverage is to be taken into account or the order in which policies are triggered." Owens-Illinois, supra, 138 N.J. at 476, 650 A.2d 974. While the Court did not mandate any one particular allocation approach or technique, it remanded the matter to the trial court with instructions that "coincident with resolving the other coverage issues, the court shall appoint a master, one skilled in the economics of insurance, to create a model for allocating the claims. Above all, the master should develop a workable system for efficient assignment and administration of the claims." Id. at 477, 650 A.2d 974. Thus, where an occurrence continues over time thereby implicating various carriers' CGL policies, which may differ as to whether they are primary or excess and as to annual limits, resolution of liability must factor both time and degree of risk assumed, and some equitable proration must be thus accomplished. Id. at 476, 650 A.2d 974. The Owens-Illinois Court drew several hypotheticals illustrating how carriers' liabilities could be calculated assuming either constant levels of policy limits during exposure years, or differing levels. Id. at 475-76, 650 A.2d 974. The Court then said:
Of course, policy limits and exclusions must be taken into account. We recognize that such even mathematical proportions will not occur, and so we must repose a substantial measure of discretion in a master who must develop the formula that fairly reflects the risks assumed or transferred.

[Id. at 476, 650 A.2d 974.]
*87 What is clear, however, is "that straight annual progression is not an appropriate measure of allocation." Id. at 475, 650 A.2d 974. Simply stated, the judge's decision does not address the Supreme Court's injunction in Owens-Illinois, supra, 138 N.J. at 479, 650 A.2d 974, that whatever method of allocation is used must reflect "both the time on the risk and the degree of risk assumed[,]" an injunction repeated by the Court in Carter-Wallace, supra, 154 N.J. at 327, 712 A.2d 1116. While it appears that all coverage issued was for primary policies, the various policies undoubtedly had different liability limits and perhaps different deductibles. The judge also failed to consider that each insurer should be deemed to have settled for its allocated share, whatever that may be deemed to be, because under Owens-Illinois, supra, the insurers' liability is pro rata. Owens-Illinois, supra, 138 N.J. at 474-78, 650 A.2d 974. Instead, the trial court's decision appears to be more nearly akin to a straight line annual progression of coverage treating Commercial as if it were the last insurer on the risk.
Had the trial judge undertaken the kind of allocation determination directed by Owens-Illinois, supra, and Carter-Wallace, supra, the prospect of future litigation over Commercial's share of the coverage costs would have been avoided. By fixing Commercial's share in terms of a percentage, the result had Owens-Illinois and Carter-Wallace principles been applied, there would be no need for further court determinations because Commercial's share would necessarily be fixed by that percentage, subject to the policy limits. But as resolved by the trial court, Commercial has the discretion to renew the allocation issue if it "is called upon in the future to pay cleanup costs in excess of what it contends ...." is its fair Owens-Illinois share. The court's decision, therefore, while addressing the coverage issues in the complaint did not resolve with certainty the allocation questions that policy considerations of judicial economy suggest should have and could have been finally resolved. And resolution of such questions did not turn on the extent of the ultimate cleanup costs, which concededly will rarely be known at the time the allocation determinations need to be made. See Owens-Illinois, supra, 138 N.J. at 446, 650 A.2d 974 (where the Court addresses the ongoing liability of the insured for having manufactured an asbestos insulation product).
The Carter-Wallace decision makes clear that only under "exceptional circumstances" should a trial court depart from the presumptive rule basing liability for damages and costs on both time on the risk and degree of risk assumed. 154 N.J. at 328, 712 A.2d 1116. And in this case defendant's denial of coverage is no more an "exceptional circumstance" than were the carriers' coverage denials in Owens-Illinois, supra, or Carter-Wallace, supra. The fact remains that the trial court's resolution of this issue nowhere reflects any consideration of the factors addressed by Owens-Illinois, supra, or Carter-Wallace, supra. Moreover, the Owens Court made clear that the allocation was to be for both coverage and defense costs. Owens-Illinois, supra, 138 N.J. at 477, 650 A.2d 974 (stating that "[t]hose losses for indemnity and defense costs should be allocated promptly among the companies in accordance with the mathematical model developed...."). While the judge saddled Commercial with all defense costs unrelated to the fraud claim from the point of Universal's notice to it, Universal's initial complaint was against seven other insurers besides Commercial, all of whom had wrongfully or improperly denied Universal's defense.
The judge's novel approach of making defendant pay only the costs of cleanup and remediation in excess of the settlements while obligating it to pay all defense costs is simply not a method suitably respectful of the Owens-Illinois and Carter-Wallace Courts' directives that allocation be based on an insurer's time on the risk and degree of risk assumed. Owens-Illinois, supra, 138 N.J. at 479, 650 A.2d 974; Carter-Wallace, supra, 154 N.J. at 327, 712 A.2d 1116. We therefore remand this issue for determinations on allocation as required by Owens-Illinois, supra, and Carter-Wallace, supra.[8] *88 IV.
Commercial also disputes the amount of counsel fees awarded to Universal in the trial of this case. Commercial concedes that in the event that it bears responsibility for at least some percentage of the overall coverage obligation, "some award of fees pursuant to the Rule is appropriate" in the current case, but argues its share should be much less than what the trial court awarded. Commercial denominates the amount awarded as "punitive" in light of the other defendant-insurers in the case, and as a result of counsel fees expended relevant to Universal's contention that Commercial exercised bad faith in handling Universal's coverage claim.
Universal sought approximately $737,900 in fees for this action. At the time the trial court decided the fee application for legal expenses in this action, Commercial asked the judge to reduce any award granted by considering the "history of the settlement negotiations," and that Universal's "bad faith" claim against Commercial was itself unrealistic. It also asserted that any award must take into consideration that it was not the "only defendant until the eve of trial."
The trial judge disallowed certain requested fees for services from additional co-counsel and other fees Universal acknowledged were incorrectly included in the application, all of which totalled approximately $29,000. Commercial also concedes that the court disallowed fees relating solely to Universal's efforts against other defendants.
Although the trial judge did not express the specific amount it was awarding at that time, the final judgment provided for a total award to Universal of $1,368,926.43. Based upon its award to Universal of $660,122.14 for legal fees in the Vineland action, it therefore appears that the actual pre-interest counsel fees awarded for this action was $708,804.30 ($1,368,926.43$660,122.74).
We agree with Commercial that the trial judge mistakenly exercised his discretion in the award of counsel fees in the declaratory judgment action. Insurers other than Commercial denied coverage to Universal, and we are informed through the parties' briefs that all of the other insureds settled with Universal "on the eve of trial." While we are satisfied that Commercial should bear the cost of the litigation after the last insurer settled with Universal, it would be unfair to saddle Commercial with what appears to be a disproportionate share of the cost of the litigation before that time. Contrary to the trial judge's perception of Commercial's intransigency, the issue of Universal's knowledge concerning the polluting properties of the waste material it discharged was far from certain. Commercial had a legitimate interest in having that issue tried and should not be punished for failing to settle with Universal. We perceive from the trial judge's findings that it was.
Undoubtedly, Universal incurred substantial discovery expenses attributable to the disclaimers issued by the other insurers. To the extent that Universal will be deemed to have settled for whatever share of the indemnity coverage that will be allocated to those insurers, it should also be deemed to have settled for whatever share of counsel fees are fairly attributable to each of those insurers under R. 4:42-9(a)(6). Commercial should be required to pay only its fair share of the expenses incurred by Universal up to the settlement by the last insurer, and a full share of the expenses thereafter. Thus, the issue is remanded for further consideration in light of the principles announced herein.

VI.
On cross-appeal, Universal complains that the summary judgment as to count four (the bad faith claim) should be reversed because the motion judge failed to fairly explicate the reasoning for the grant. The judge indicated the motion was granted because of the "substantial grounds" set forth in the defendant-insurers' "voluminous papers."
*89 Assuming that the motion judge could have further explicated the reasons for his decision, Universal identifies no particular prejudice suffered as a result, contending instead a due process violation without specification. But a "generalized claim of a deprivation of substantial rights is an ill-advised and improper mode of appellate practice." State v. Gaines, 147 N.J.Super. 84, 93, 370 A.2d 856 (App.Div.1975), aff'd o.b. sub nom. State v. Powers, 72 N.J. 346, 370 A.2d 854 (1977). The fact that Universal can articulate the reasons it feels the motion judge erred clearly shows there was no prejudice here by the judge's failure to comply with R. 1:7-4.
Universal argues that the record below fairly established as a matter of law that Commercial failed "to conduct a thorough, objective, and good-faith investigation prior to determining coverage and [ ] den[ied] the claim without any proper basis in the facts or applicable New Jersey law." We disagree.
Universal's risk manager Mike Mendes spoke with Commercial's Drew Selman prior to the coverage denial and informed Selman that lead oxide and antimony oxide were some "of the chemicals [dumped] in the back," and that Universal "never dumped in the area of the Vineland fill." Mendes also told Selman that "enameling powder" and "slag" were among the materials routinely deposited out back, which wastes were not transported off site. Thus, prior to denying coverage Commercial had in fact collected information on Universal's routine waste disposal methods at the plant, and it was ultimately those methods, in light of the arguable harmfulness of some of the waste, that formed the critical issue in this case.
Nothing in the record indicates that had Commercial undertaken a lengthier or more in-depth investigation, it manifestly would have come to the conclusion that coverage was triggered and this suit would have been avoided. While Commercial's decision as such was erroneous, that is not the equivalent of bad faith.
Under Pickett v. Lloyd's, 131 N.J. 457, 473, 621 A.2d 445 (1993), the dispositive determination is whether the claim of bad faith is "fairly debatable." If so, no liability will attach. Ibid. In this case the motion judge had sufficient facts upon which to base a finding that the information in Commercial's possession as of the time of its denial letter made the bad faith claim "fairly debatable" as a matter of law. Commercial undertook some investigation, including contacting Universal on numerous occasions to request information. Selman followed up contacts with Universal by making further inquiries. Commercial need not prove that it conducted a fool-proof investigation; it clearly did not ignore the claim.
Universal, however, argues that Commercial's conduct was improper under portions of N.J.S.A. 17:29B-4 (unfair claims settlement practices), implying that a determination of whether Commercial violated parts of that statute is required independent of the Pickett standard. But in fact the Supreme Court in Pickett, supra, 131 N.J. at 468-69, 621 A.2d 445, expressly referred to the provisions Universal points to here. For example, in discussing the development of the law governing actions by an insured against an insurer for its failure to settle a direct claim, what is referred to as a "first-party" claim, the Court said:
Moreover the New Jersey Legislature has defined the relationship between insurance companies and insureds by promulgating a broad range of statutory provisions. For example, N.J.S.A. 17:29B-1 to -14 regulates the insurance trade by defining and prohibiting unfair practices, among them, "Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." N.J.S.A. 17:29B-4(9)(f).[9]

[Id. at 467-68, 621 A.2d 445.]
The Court then set a standard for measuring the insurer's duty given the existence of such statutes, and clarified that the breach of that duty created a cause of action "for bad-faith failure to pay an insured's claim ...." which cause of action was "consistent with New Jersey law." Id. at 470, 621 A.2d 445. In *90 short, nothing indicates that the statutes establish a different or additional standard apart from the one articulated in Pickett.
Universal also argues that Pickett is not applicable in this case because it involved first-party insurance, whereas this action was based on third-party coverage. While it is true that the circumstances in Pickett involved first-party coverage, that distinction is not dispositive or even of substantive effect. First, Universal identifies no particular policy reason why, for purposes of evaluating bad faith claims against an insurer, it should matter whether the coverage at issue is first-or third-party. Presumably in either case the insured deserves the same consideration and enjoys the same rights as to fair treatment from the carrier.
Further, a reading of Pickett discloses that its reasoning is in part based upon the same principles applied in third-party coverage cases. For example, the Court began its analysis with reference to Rova Farms, supra, where
this Court held that an insured may recover more than the policy limit for a liability insurer's bad-faith refusal to settle a third-party claim against its insured within that limit, when the refusal results in the third party obtaining a judgment against the insured that exceeds the policy limit.
[131 N.J. at 465, 621 A.2d 445 (emphasis added).]
Later in the opinion, in recognition of a claim for so-called bad-faith failure to pay a claim, the Court again quoted from its earlier decision in Rova Farms, supra, to the effect that "[a]n insurance company's breach of the fiduciary obligation imposed by virtue of its policy, by its wrongful failure to settle, `sounds in both tort and contract.'" Id. at 470, 621 A.2d 445 (quoting Rova Farms, supra, 65 N.J. at 504, 323 A.2d 495).
Based on the Pickett standard, therefore, the motion judge properly granted the insurers summary judgment on plaintiff's bad-faith claim.
The judgment under review is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
NOTES
[1] The judge also found that the evidence was insufficient to find that arsenic was discharged by Universal as part of the manufacturing process. That finding is not challenged on appeal.
[2] The parties stipulated below to the applicable policy provisions.
[3] While the policy also provided a separate definition of "underground property damage hazard," the parties do not address it inasmuch as it evidently applied only to property damage underground to man-made articles, mechanical plants, mechanisms and the like.
[4] We reject Universal's effort to justify the trial judge's conclusion by relying on Carter-Wallace, Inc. v. Admiral Ins. Co., 154 N.J. 312, 712 A.2d 1116 (1998). As far as we can determine, the Commercial policy involved in that case was an occurrence policy without a standard pollution-exclusion clause. Id. at 328, 712 A.2d 1116.
[5] Defendant acknowledged at oral argument before us that the more accurate exclusion is the alienated property exclusion because the property was sold to Vineland. However, because both exclusions have the same legal effect, the distinction is one without a difference.
[6] Based on defendant's calculation, the total available coverage from all carriers issuing policies during the period 1930 and thereafter was $29,338,460. Defendant then computed its share of such total coverage at 3.41% ($1,000,000-$29,338,460=.03408). At oral argument, defendant conceded that its total exposure is actually $3 million, thereby increasing its share of counsel fees.
[7] The amounts of those settlements were not disclosed in the record.
[8] Defendant argues, in a footnote, that if a remand is necessary the case should not be remanded to the trial judge. We decline to address the issue. Appellate rules require that each issue for which the appeal is brought must be presented in a separate point heading. R. 2:6-2(a)(5); Almog v. Israel Travel Advisory Serv., Inc., 298 N.J.Super. 145, 155, 689 A.2d 158 (App.Div.), certif. granted, 151 N.J. 463, 700 A.2d 876 (1997), appeal dismissed, 152 N.J. 361, 704 A.2d 1297 (1998).
[9] Plaintiff argues that this particular section applies here.