292 N.J. Super. 463 (1996)
679 A.2d 160
ADRON, INC., PLAINTIFF-APPELLANT,
v.
THE HOME INSURANCE COMPANY, FIRST STATE INSURANCE CO., HARTFORD ACCIDENT AND INDEMNITY CO., COLUMBIA CASUALTY COMPANY, AND THE INSURANCE COMPANY OF NORTH AMERICA, DEFENDANTS-RESPONDENTS, AND THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, COMMERCE & INDUSTRY INSURANCE CO., NATIONAL UNION FIRE INSURANCE, BIRMINGHAM FIRE INSURANCE CO., EMPLOYERS INSURANCE OF WAUSAU, NORTH RIVER INSURANCE COMPANY, HIGHLANDS INSURANCE COMPANY, NORTHBROOK PROPERTY AND CASUALTY COMPANY, AND MISSION INSURANCE CO., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 15, 1996.
Decided July 22, 1996.
*465 Before Judges SHEBELL, STERN and NEWMAN.
Andrew Muscato argued the cause for appellant (Whitman, Breed, Abbott & Morgan, attorneys; Mr. Muscato, John V. Thornton and John M. O'Reilly, on the brief; Mr. Muscato and John V. Thornton, on the reply brief).
Mary Ellen Scalera argued the cause for respondent, The Home Insurance Company (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; Ms. Scalera, of counsel, and on the brief; Heidi P. Rubin Cohen, on the brief).
John M. Bowens argued the cause for respondents, First State Insurance Company and Hartford Accident And Indemnity Company (Purcell, Ries, Shannon, Mulcahy & O'Neill, attorneys; Mr. Bowens, of counsel, and on the brief; David C. Barry, on the brief).
Paul Leodori argued the cause for respondent, The Insurance Company of North America (Ruggerio, Leodori & Celentano, attorneys; Mr. Leodori, of counsel, and on the brief).
Laura A. Foggan (pro hac vice) of Wiley, Rein & Fielding and Wendy L. Mager argued the cause amicus curiae for Insurance Environmental Litigation Association (Smith, Stratton, Wise, Heher *466 & Brennan, attorneys; Ms. Mager, on the brief; Ms. Foggan, Susan D. Sawtelle and Steven D. Silverman, of counsel).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
Plaintiff, Adron, Inc., a long-time manufacturer of fragrances, caused, commencing in 1960, numerous fifty-five-gallon drums of hazardous material by-product to be buried on its site in East Hanover. Its 1984 sale of the plant triggered the requirements of the Environmental Cleanup Responsibility Act (ECRA) (N.J.S.A. 13:1K-6 to -13) now known as the Industrial Site Recovery Act (ISRA). To consummate the sale, plaintiff entered into a consent order with the Department of Environmental Protection (DEP) to monitor and remediate pollution on the site. Thereafter, plaintiff submitted various cleanup plans to DEP based on data obtained from monitoring wells drilled on and soil samples taken from the property. As cleanup progressed, DEP asserted plaintiff had contaminated groundwater.
Plaintiff subsequently filed this declaratory judgment action against defendants, its comprehensive general liability ("CGL") insurers, for indemnity from the costs of cleanup. Defendants maintained that the pollution was confined to plaintiff's site, and that the "owned property" exclusion in the policies prevented indemnification.
Ultimately DEP approved, subject to ongoing monitoring, plaintiff's cleanup plan. Thereafter, DEP issued two directives under the Spill Compensation and Control Act (Spill Act) (N.J.S.A. 58:10-23.11 to -23.11z) alleging that plaintiff and various other parties in the region had contaminated area groundwater. Plaintiff moved to amend its complaint for coverage against the Spill Act claims as it pertained to this site, and defendants moved for summary judgment. The Law Division judge granted summary judgment to defendants on the basis that plaintiff had failed to establish that it had been forced to pay any damages for off-site contamination. The judge, in a written opinion dated September *467 15, 1993, denied plaintiff's motion to amend reasoning that plaintiff's Spill Act claims were better added to an action then pending in Middlesex County, where plaintiff had sought insurance coverage against the Spill Act claims for sites other than this. On October 4, 1993, plaintiff moved for reconsideration, and on October 22, 1993, following a second hearing, the judge entered an order denying that motion. Plaintiff appeals.
Plaintiff now argues that questions of material fact as to contamination of groundwater precluded the judge from granting defendants summary judgment, and that the judge erred in denying plaintiff's motion to amend its complaint to add its claim for insurance coverage of this site against DEP's Spill Act claims.
Plaintiff, a New York corporation manufacturing flavors and fragrances at several facilities, maintained a facility on eleven acres on Route 10 in East Hanover. The site included several buildings housing processing, laboratory, storage, maintenance and administrative facilities. Activities included blending of flavor and fragrance ingredients, extracting and distilling natural fragrances and flavors, and research and development. The complex was located above the Buried Valley aquifer system, designated a "sole source aquifer" by the United States Environmental Protection Agency (EPA) because the aquifer supplied water to fifty percent or more of the area's population.
On September 27, 1984, plaintiff executed a contract with Unilever United States, Inc. (Unilever) to sell the property and its manufacturing operations. On October 4, 1984, plaintiff submitted its initial ECRA disclosure statement. In November 1984, plaintiff provided DEP with its Site Evaluation Submission (SES) and Geohydrologic Investigation and Consultation report (GIC) that had been prepared for it by Dames & Moore (Dames), the company it had retained to investigate the site and assist in any necessary remediation.
The submissions identified several possible sources of contamination found on the property, including: the spilling of chemicals from two buildings that caught fire in 1947 and 1960 and the *468 leaching into the soil of water used to fight those fires; plaintiff's filling, in the early 1960s, a low-lying area with drums containing "hard residue" generated after the manufacture of certain products; and plaintiff's burying at several points on the property, also in the early 1960s, fifty-five-gallon drums filled with "hard residue" and by-products of distillation. Among the commercially hazardous substances identified as having been used by plaintiff in manufacturing were methylene chloride and toluene, solvents used in the extraction process, and trichloroethylene (TCE), "a solvent" used for "removing grease" and cleaning equipment.
Five monitoring wells and several test pits were created. One of the wells, MW-5, was mistakenly drilled on a neighboring property. The GIC report indicated that, although not all chemicals were found in all monitoring wells and soil samples, hazardous chemicals such as methylene chloride, 1-2-dichloroethane, chloroform, carbon tetrachloride, toluene and TCE were present in varying degrees in groundwater samples taken from the different monitoring wells, including MW-5, while toluene, ethyl benzene and chloroform were among the chemicals found in the soil. TCE and other hazardous chemicals were detected in several off-site wells in the East Hanover area. The GIC report listed proposed cleanup procedures and remediation cost estimates.
DEP conducted a preliminary site inspection, and on December 18, 1984, sent plaintiff a preliminary inspection report including its findings and requirements under ECRA. On December 21, 1984, it entered into an administrative consent order with DEP regarding cleanup of the property. On April 3, 1985, Dames filed an addendum to its earlier GIC report. In addition to specifying the various hazardous substances detected in the groundwater and soil samples at the property, the addendum listed several conclusions, one of which was that "[c]ompounds which may be associated with [plaintiff's] manufacturing processes were identified in Test Pit N and groundwater samples." The addendum added that "[u]ntil the quality of groundwater entering the site can be established, it *469 is not possible to identify the source of groundwater contamination."
In a letter to plaintiff in May 1985, DEP reviewed plaintiff's submissions, and concluded that two samples from the five monitoring wells "indicate that activities ... [on plaintiff's site] ... have led to contamination of ground water." It directed plaintiff to continue monitoring the area and to drill additional test wells to facilitate a "thorough hydrogeological investigation." On July 16, 1985, DEP directed plaintiff to prepare a sampling and cleanup plan, and Dames continued investigating the site. Dames's subsequent sampling plan report identified eleven areas at the site as "areas of investigation" requiring further study in order to delineate possible hazardous substances on the property. Meanwhile, drums of contaminants were being removed, and tested, in accordance with the sampling plan. Dames discovered approximately 3500 fifty-five-gallon drums buried in cell areas no. 2, 3, 4 and 5 of Area S-6, and estimated that over 500 additional drums were buried in area S-5.
In a letter to DEP in June 1987, Dames updated activities at the site and related the results of its 1984 and 1987 soil and water analyses. Comparing the "priority pollutant volatile compounds" detected in both sets of groundwater samples across the site to the compounds found in the subsoils of cell area 4, Dames reported that only three compounds  methylene chloride, TCE and toluene  were found in both the water and the soils. As of 1987, however, only methylene chloride and TCE were detected in both water and soil samples. In MW-2, "located immediately downgradient" of drum cell 4, Dames found that methylene chloride was the only priority pollutant volatile compound present. Dames then concluded that "[s]ince different suites of compounds are found in Cell No. 4 and ground water samples obtained both across the site and immediately downgradient of the excavation, it appears that the drum cell is not responsible for compounds detected in ground water."
*470 In an October 1987 letter, however, DEP noted that certain hazardous substances found in downgradient wells were not found in upgradient ones. It stated that, based on the well monitoring results, the buried drum location directly upgradient of MW-2 (i.e., cell 4), "remains a prime suspect for the source of TCE contamination" found in "high levels" in MW-2. It directed that more wells be drilled.
In a February 23, 1989, letter, DEP directed plaintiff to conduct further groundwater testing, reasoning that the substances plaintiff placed in the ground might be a cause of the groundwater pollution, and stating that "[s]ignificant downgradient concentrations of contaminants have been found in on-site wells which are not present in the furthest on-site upgradient wells." It ordered plaintiff to install additional testing wells, including off-site wells. A total of eighteen wells were created.
By August 1989 plaintiff took the position that DEP had long recognized that the groundwater contamination problem was regional, and that to date it had "not provided any evidence that shows that this site [is] ... the source of [off-site] ... contamination," and contested DEP's assertion that it had created any off-site contamination. In December 1989 plaintiff wrote DEP that it was "convinced that groundwater either from an upgradient or sidegradient source is responsible for all groundwater contamination on site." In June 1990, DEP approved, with certain conditions, plaintiff's amended cleanup plan and ordered plaintiff to continue monitoring groundwater at the site. DEP noted that plaintiff "has not yet conclusively demonstrated ... that the remaining buried drums in area S-5 have not adversely impacted ground water (are not a source of ground water contamination)."
Dames reported in December 1990 that "low levels of volative organics were detected" from on-site well samples; nevertheless, it also pointed out that these contaminants were found only in the wells in the upgradient and northern upgradient portions of the property. It thus concluded that the "data suggest an upgradient, off-site source of contamination coming on site." Dames's project *471 manager, however, related that plaintiff used toluene and methylene chloride in its manufacturing processes, and that these chemicals, along with TCE, were present in the soils surrounding the drums where the manufacturing "process waste" and "still bottoms"  residue from plaintiff's manufacturing distillation process  were found. He also described the methylene chloride and TCE that Dames found in the groundwater at the property. In February 1992, plaintiff had another study performed by Warzyn, Inc. (Warzyn) that concluded that the buried drums in Area S-5 had not impacted ground water beneath that area. It reported that plaintiff was continuing to remove buried drums and soil from that area.
As of November of 1991, plaintiff had spent over $3 million in cleaning up the property and in avoiding off-site migration of contaminants. Between 1972 and 1986, plaintiff had obtained from defendants CGL coverage for the property, with "per occurrence" liability limits ranging from $500,000 to $15 million. Typically, the policies stated that the insurer "would pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence...." An "occurrence" was typically defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." "Property damage" meant:
(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
The policies listed many exclusions, including the "owned property" exclusion relied on by the Law Division judge, whereby coverage was expressly excluded
to property damage to (1) property owned or occupied by or rented to the insured, (2) property used by the insured or (3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control; but parts (2) and (3) of this exclusion do not apply with respect to liability *472 under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of elevators at premises owned by, rented to or controlled by the named insured.
According to plaintiff, it demanded coverage under the policies from defendants, but each rejected plaintiff's requests.
Meanwhile, in April 1991, DEP sent plaintiff and numerous other parties engaged in commercial activity in the region a directive under the Spill Act. It identified plaintiff's past practice of burying "more than 4,700" fifty-five-gallon drums holding contaminants, and listed numerous contaminants found in on-site groundwater monitoring wells. The directive declared that plaintiff and the other parties were "responsible for the discharge of hazardous substances in East Hanover," directed the parties to notify it of their insurers, and ordered plaintiff to submit "a proposed work plan" for its approval.
In April 1993, DEP sent plaintiff and the other parties a second directive rescinding the 1991 directive, but naming plaintiff a "respondent" for purposes of prosecuting regional cleanup, and set forth the manner in which it expected all respondents to comply with the Spill Act requirements covering pollution remediation of the regional groundwater. It said that DEP "believes [respondents] to be responsible for the discharge of ... hazardous substances."
In June 1993, plaintiff filed a separate action in Middlesex County against its insurers seeking a declaration of coverage for the costs of any cleanup required under federal law, the Spill Act, the New Jersey Water Pollution Control Act (N.J.S.A. 58:10A-1 to -46) and ECRA, at various of its plants in Maryland, Pennsylvania and New Jersey. The property at issue here was not listed in its complaint until September 21, 1993, when plaintiff amended its complaint to include the property.
We reverse the grant of summary judgment. Rule 4:46-2 requires that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is *473 no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." The motion judge must consider whether the available competent evidence, when viewed in the light most favorable to the non-moving party, is sufficient to permit a rational factfinder to resolve the disputed issue in favor of the non-moving party. Brill v. Guardian Life Insurance Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). On appeal of a grant or denial of summary judgment, we apply the same standard as the trial court. Allstate Redevelopment Corp. v. Summit Assocs. Inc., 206 N.J. Super. 318, 327, 502 A.2d 1137 (App.Div. 1985).
The interpretation of an insurance contract is a question of law for the court to determine, and can be resolved on summary judgment. Weedo v. Stone-E-Brick, Inc., 155 N.J. Super. 474, 479, 382 A.2d 1152 (App.Div. 1977), reversed on other grounds, 81 N.J. 233, 405 A.2d 788 (1979). Under the policies, defendants were required to "pay on behalf of [plaintiff] all sums which [plaintiff] shall become legally obligated to pay as damages because of ... property damages to which this insurance applies, caused by an occurrence...."
The burden was initially on plaintiff to bring the claim within the basic terms of the policy. Tauriello v. Aetna Ins. Co., 14 N.J. Super. 530, 532, 82 A.2d 226 (Law Div. 1951). Accord, United Bond & Mortgage Co. v. Concordia Fire Ins. Co. of Milwaukee, 113 N.J.L. 28, 29, 172 A. 373 (E. & A. 1934). Defendants had the burden of establishing that any matter fell within the exclusionary provisions of the policy, and the "owned property" exception was such an exclusion. Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 26, 483 A.2d 402 (1984). For purposes of obtaining summary judgment, defendants' burden was to show that, factually, plaintiff had failed to meet its prima facie case, Bilotti v. Accurate Forming Corp., 39 N.J. 184, 205-06, 188 A.2d 24 (1963), or that as a matter of law, defendants had demonstrated the applicability of an exclusion, thereby negating coverage.
*474 Plaintiff asserts it has spent over $3 million to remediate contaminants on the property, and claims it has spent at least part of that sum to "avoid off-site migration of contaminants found to be present in ground water by monitoring and testing." While the present record is inadequate to determine what portions of the expenditure related to groundwater remediation, it is evident that plaintiff may be able to demonstrate it incurred expenses directly related to DEP's demands for monitoring and remediation based on reports of groundwater contamination. See Broadwell Realty Srvs. v. Fidelity & Cas. Co. of N.Y., 218 N.J. Super. 516, 527-28, 528 A.2d 76 (App.Div.), overruled in part on other grounds, Morton Int'l v. General Acc. Ins. Co. of Am., 134 N.J. 1, 28, 629 A.2d 831 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994) (a DEP directive threatening an insured with triple the cost of cleanup constituted a claim for damages within the meaning of the CGL policy). Thus, plaintiff has established a prima facie case.
We have held in Morrone v. Harleysville Mut. Ins. Co., 283 N.J. Super. 411, 419-20, 662 A.2d 562 (1995), as well as in other cases decided today, that groundwater contamination is not excluded by the "owned property" exclusion in CGL policies. See also Reliance Insurance Co. v. Armstrong World Industries, 292 N.J. Super. 365, 678 A.2d 1152 (App.Div. 1996) and Kentopp v. Franklin Mut. Ins. Co., 293 N.J. Super. 66, 679 A.2d 701 (App.Div. 1996). We, therefore, conclude that the "owned property" and related "use" and "care, custody or control" exclusions are inapplicable and remand for a determination of plaintiff's damages related to groundwater monitoring and remediation costs in accordance with the above mentioned cases.
Plaintiff also says that the judge erred in refusing to allow it to amend its complaint to add claims against its insurers for its liability under DEP's 1993 Spill Act directive. It claims that resolving the Spill Act coverage issues in this action "will prevent inconsistent administrative and judicial determinations." It contends defendants will not be prejudiced by its amended complaint *475 inasmuch as the basis of the Spill Act liability claims is found in plaintiff's ECRA reports, already disclosed to them in discovery below. We agree.
Under N.J.A.C. 7:26C-2.5, a Spill Act directive "is intended to constitute a clear, written notice of the person's potential liability under N.J.S.A. 58:10-23.11 for any costs of cleanup, civil penalties or damages, and to provide that person a timely opportunity to respond to the directive." N.J.A.C. 7:26C-2.5(b) (emphasis added). The Spill Act directives were issued in April 1991 and April 1993. Plaintiff has filed a separate action against its insurers seeking coverage for various of its sites, alleging that DEP and EPA had commenced actions against it for violating various state and federal laws, including the Spill Act.
At a June 24, 1993, case management conference, the judge postponed defendants' summary judgment motions and permitted plaintiff to file a motion to amend its complaint to add Spill Act coverage claims. Defendants received through discovery in this case all of its reports to DEP as to DEP's ECRA claims, and had all necessary discovery from DEP's Spill Act claims. Nevertheless, while DEP is evidently satisfied with plaintiff's efforts to comply with its ECRA requirements (e.g., DEP's June 1990 letter approving, with conditions, plaintiff's cleanup plan), DEP's ultimate conclusions with respect to the Spill Act requirements and plaintiff's ultimate position with respect to those requirements were unknown to the motion judge.[1]
Under R. 4:9-1, a party may amend his or her complaint, after his or her adversary has filed an answer, "only by written consent of the adverse party or by leave of court which shall be freely given in the interest of justice." Although the court must be concerned that "no undue delay or prejudice will result from the amendment," Tomaszewski v. McKeon Ford, Inc., 240 N.J. Super. 404, 411, 573 A.2d 501 (App.Div. 1990), it must weigh such factors *476 against the overriding need to seek justice. Cf. Sarner v. Sarner, 45 N.J. Super. 216, 221, 132 A.2d 28 (App.Div.), certif. denied, 25 N.J. 103, 135 A.2d 59 (1957). In light of the fact-specific nature of the Spill Act claim as it pertains to this property, we hold that the amendment should have been granted.
Reversed and remanded.
Judge STERN concurs for the reasons expressed in his concurring opinion in Reliance Insurance Co. v. Armstrong World Industries, 292 N.J. Super. 365, 678 A.2d 1152 (App.Div. 1996).
NOTES
[1] We have denied respondents' application to supplement the record as to the present status of DEP's position.