**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0570-24

ILYA KUSHNER and
FRANCIS GUZMAN,

    Plaintiffs-Appellants,

v.

FARMERS OF SALEM,

    Defendant-Respondent.

_____

Submitted September 23, 2025 – Decided October 31, 2025

Before Judges DeAlmeida and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-4832-23.

Jeffrey A. Bronster, attorney for appellants.

Methfessel & Werbel, attorneys for respondent (Gina M. Stanziale, on the brief).

PER CURIAM

    Plaintiffs, Ilya Kushner and Francis Guzman, appeal from a September 16, 2024 order of the Law Division granting summary judgment in favor of

defendant, Farmers of Salem, and from a subsequent October 25, 2024 order, denying plaintiffs' motion for reconsideration.  Plaintiffs assert the trial court erroneously found defendant properly rescinded homeowners' insurance coverage after a fire destroyed plaintiffs' newly purchased house roughly six weeks after plaintiffs closed on the sale.  The court found defendant correctly determined plaintiffs had not "customarily occupied" the property as the homeowners' insurance policy (the policy) required.  We affirm.

I.

A.

We review the factual record in the light most favorable to plaintiffs as the non-moving party, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995), and the following facts are largely undisputed.  On June 13, 2023, plaintiffs purchased a home in Harrington Park, and defendant issued plaintiffs a homeowners' insurance policy.  A fire destroyed the house on July 29, 2023, resulting in a total loss.

Plaintiffs obtained the policy after submitting an insurance application to defendant on June 1, 2023.  The application identified the "occupancy" as "Owner Occupied Primary."  The following pertinent questions appeared on the application:  "Will any part of the house be vacant or unoccupied?" and "Is the

A-0570-24

building undergoing renovations or construction?" The response column reflected "No" next to both questions. The column located to the right of the response column for each question, entitled "Remarks if applicable," was left blank.[1] The following language appeared on that same page: "Days Until Occupied (if applicable): 0-30 Days." Kushner's signature appeared under a statement representing, "I have read the above application and I declare that to the best of my knowledge and belief all of the foregoing statements are true."

Coverage commenced on the day of the closing. The policy contained language, under the heading "Additional Policy Provisions," specifically requiring the residence be "customarily occupied." That phrase was not further defined in the policy, which stated: "Unless otherwise agreed to in this policy by us, it is understood that the covered dwelling is owned and customarily occupied by you and this is the condition of hazard and use that we undertake to insure under this policy." The same section contained a provision entitled "Losses Not Insured," and stated:

The following exclusion is added:

---

[1] The responses and signature in the copy of the application included in plaintiffs' appendix appear to have been entered via electronically fillable format. The signature also appears electronically authorized.

A-0570-24

**Other Than Owner Occupancy Exclusion**
We do not provide insurance for a covered dwelling that is not owned and customarily occupied by you.

A provision entitled, "Liability Not Insured," similarly provided:

The following exclusion is added:

**Other Than Owner Occupancy Exclusion**
We do not cover bodily injury or property damage arising out of a covered dwelling that is not owned and customarily occupied by you.

After the fire, plaintiffs filed a claim with defendant for first-party property damage under the policy. After investigating, defendant denied plaintiffs' claim. By letter dated August 31, 2023, defendant first notified plaintiffs that it was rescinding the policy and declaring it "void back to the inception date of June 13, 2023." Defendant indicated it considered the policy void because it was issued in reliance upon plaintiffs' material misrepresentations regarding intended renovations and intent to occupy.

By letter dated September 5, defendant advised plaintiffs that their claim had been denied, again explaining the policy had been rescinded. Defendant indicated its investigation revealed "the dwelling was undergoing renovations and unoccupied on the date of loss, as well as at the time the policy incepted on June 13, 2023." Specifically, defendant indicated plaintiffs "hired a contractor by the name of Ronnie Garcia" to perform renovations on the house, which

4

constituted a "misrepresentation" on the insurance application. Further, defendant determined plaintiffs did not occupy the premises because "[t]he only contents in the home were some boxes of clothing in the garage and a box of Derek Jeter memorabilia in the basement."

On September 7, 2023, plaintiffs filed a complaint against defendant alleging breach of contract and bad faith. They asserted they complied with the terms of the policy, their insurance application contained "no material misrepresentations of existing fact," and "defendant's attempted recission was a bad faith effort to avoid payment of plaintiffs' claim." Defendant's answer alleged various defenses, including: "the property in question was not owner occupied at the time of the loss and there [wa]s no coverage," and "plaintiff made a material misrepresentation in the application and the insurance policy is deemed void ab initio."

Discovery revealed certain undisputed facts. At the time of the fire, plaintiffs were staying in a rental house nearby; they were not sleeping or eating in the new house. There was no power to the home when the fire occurred, the home was not yet furnished, and only six boxes were in the garage and basement.

In his deposition, Ilya Kushner explained, prior to the closing, plaintiffs consulted Garcia to perform work on the house. Garcia's estimate, dated May

5

16, 2023, pertained to several projects, including bathroom remodeling, gas pipe framing, water pipe removal, wall removal, painting of the entire house, and carpet removal. Kushner indicated plaintiffs ultimately decided to hire Garcia to paint the house and repair the floors and to forego additional repairs until they moved into the home. He also claimed plaintiffs originally intended to move in "right away," while Garcia performed the work, but, at the walk through, they realized the floors needed work and feared their son, with a sensory sensitivity, would be disturbed by the noise.

Garcia began working on the premises two days after the closing and testified he installed tiles in the bathroom, painted the walls, and demolished a wall in the dining room before the fire occurred. Kushner visited the home occasionally to monitor the progress of Garcia's work, which Kushner indicated took longer than estimated. Kushner also claimed Garcia "scammed" plaintiffs by charging them an inflated cost for cabinets over the amount Garcia paid. Plaintiffs extended their rental home lease, originally set to end on July 31, 2023, to August 15, 2023.

Kushner contended he never misrepresented his intentions on the insurance application, as he anticipated moving in right away until the walk through when he realized the floors needed work. He believed Garcia could

6

quickly paint and complete the floorwork, never anticipating the eventual delay. He denies inserting the "0-30 days" statement regarding taking occupancy, claiming "no one ever asked [him] when [he] was moving in, and [he] had no idea it was even 'applicable' to [his] situation." Plaintiffs further disputed that Garcia's work constituted "renovations" or that the house was "unoccupied" at the time of the fire.

B.

Defendant moved for summary judgment alleging the policy was void on two grounds: (1) plaintiffs violated the policy's terms because they never "customarily occupied" the house at or before the time of the fire; and (2) plaintiffs materially misrepresented the status of their renovations and their intended occupancy of the house in their insurance application. Defendant argued the policy's "clear and unambiguous" language required that plaintiffs "customarily occupy" the premises and entitled defendant to rescind the contract as plaintiffs admitted they did not move into or live in the home at the time it was destroyed. Defendant further contended plaintiffs conceded they never intended to move in immediately.

Plaintiffs countered that the phrase "customarily occupied" is ambiguous and should be construed in plaintiffs' favor. They asserted they answered the

A-0570-24

questions on the insurance application truthfully and never expected "any part of [the house] was going to ultimately be unoccupied or vacant." Further, they contended there was no construction or renovation occurring at the time of the application. They argued, alternatively, their intent was a disputed issue of material fact that prevented summary judgment as to any claim of misrepresentation.

On September 16, 2024, the court granted summary judgment, finding, "there [we]re no genuine issues of material fact . . . as the plaintiffs were not 'customarily occupying' the subject property." The trial court cited the policy's language, including the exclusionary clause, which stated, "We do not cover bodily injury or property damage arising out of a covered dwelling that is not owned and customarily occupied by you." The court relied upon Black's Law Dictionary that defined "customarily" as "usually, habitually, according to custom; general practice or order of things; regularly." Accordingly, the court found the exclusionary language was "plain and unambiguous," and "no other conclusion can be reached than the plaintiffs did not customarily occupy the subject property."

In reaching its decision, the trial court addressed the evidence in the record and determined "plaintiffs did not take occupancy of the property prior to the

A-0570-24

fire." It recognized: "[T]he plaintiffs have admitted that at no time did they occupy the subject property. They did not live there, sleep there, or eat there. They had no possessions other than [six] boxes which were kept in the garage and the basement." At the time of the fire, plaintiffs were residing at the premises they rented, pursuant to a lease agreement which they extended. There was no power at the new residence, and the mail was delivered to the rental address. The court cited to the May 2023 estimate for renovations plaintiffs obtained from Garcia, and noted plaintiffs "purchased a stove on July 14, 2023, for installation at the subject property."

The court found "defendant issued the subject policy of insurance in reliance upon the statements contained in the insurance application." It noted, "plaintiffs admitted that they wanted to do work on the subject property before moving in." The court further highlighted Kushner's answering "no" to the question, "Is the building undergoing renovation or reconstruction?"

Plaintiffs moved for reconsideration.[2] The court denied the application, finding no basis to review its decision, but clarified its prior order "provide[d] for recission of the policy rendering it void ab initio and further declare[d] no

---

[2] The record does not reflect plaintiffs' precise claims before the trial court and it appears no oral argument took place.

coverage," and "both declarations [we]re proper under the circumstances." The court explained its earlier decision "relie[d] squarely and solely on the owner-occupancy exclusion, not the material misrepresentations in the application for insurance." The court found that because the premises were never "customarily occupied" and "the entire policy was issued based on that perceived condition of coverage" the court did not "rescind the policy based on material misrepresentation." The court noted, "to that end, the failure of plaintiffs to disclose that the property was not owner occupied permits the defendant to void the policy." Reasoning it could not reform the contract to change the terms or language, the court also refused to supplement the "customarily occupied" language to afford a "reasonable" window for occupancy or otherwise alter what it found to be the plain meaning of the policy.

II.

A.

Plaintiffs appeal, arguing the court erred in granting summary judgment and denying reconsideration. They contend: (1) the phrase customarily occupied is vague and should have been construed in a manner to further the goal of precluding insureds from obtaining policies for rental properties at lower premiums by misrepresenting the properties as owner-occupied residences; (2)

10

construing "customarily occupied" to require owners to immediately move in, reside, and sleep in the dwelling would lead to exclusions no matter the duration of time between closing and taking up residency; and (3) at a minimum, a factual dispute existed regarding the veracity of plaintiffs' answers in the insurance application and summary judgment was thus improper.

Defendant asserts this court should decline to consider plaintiffs' arguments concerning misrepresentation as the trial court did not grant summary judgment or address the issues of material misrepresentation and, instead, granted summary judgment "solely on the 'owner-occupancy' exclusion contained in the subject policy." Consequently, according to defendant, because "owner occupancy [wa]s an actual condition of coverage" and coverage was expressly excluded for losses to premises not customarily occupied, the court correctly found plaintiffs failure to fulfill this condition of coverage was properly denied, warranting summary judgment in its favor.

## B.

"We review de novo the trial court's grant of summary judgment, applying the same standard as the trial court." Abboud v. Nat'l Union Fire Ins., 450 N.J. Super. 400, 406 (App. Div. 2017) (citing Templo Fuente de Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016)). "To decide

A-0570-24

whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 450, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). "The court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill, 142 N.J. at 540).

We review a trial judge's decision on whether to grant or deny a motion for reconsideration under Rule 4:49-2 for abuse of discretion. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021). "The rule applies when the court's decision represents a clear abuse of discretion based on plainly incorrect reasoning or failure to consider evidence or a good reason for the court to reconsider new information." Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 4:49-2 (2026).

"The interpretation of an insurance contract typically raises questions of law. Consequently, it is generally appropriate to resolve such questions on summary judgment." Khandelwal v. Zurich Ins. Co., 427 N.J. Super. 577, 585 (App. Div. 2012) (citing Adron, Inc. v. Home Ins. Co., 292 N.J. Super. 463, 473 (App. Div. 1996)). In general, the principles governing the interpretation of

insurance policies "must be analyzed under the rules of 'simple contract law.'" Cypress Point Condo. Ass'n v. Adria Towers, L.L.C., 226 N.J. 403, 415 (2016) (quoting Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960)). "Well-settled contract law provides that '[c]ourts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" Id. (alterations in original) (citing Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014)).

In determining the parties' intent, "the basic rule is to determine the intention of the parties from the language of the policy, giving effect to all parts so as to give a reasonable meaning to the terms." Simonetti v. Selective Ins. Co., 372 N.J. Super. 421, 428 (App. Div. 2004) (citing Stone v. Royal Ins. Co., 211 N.J. Super. 246, 248 (App. Div. 1986)). Importantly, "[a]s contracts of adhesion, [insurance] policies are subject to special rules of interpretation . . . [and] should be construed liberally in the insured's favor to the end that coverage is afforded to the full extent that any fair interpretation will allow." Duddy v. Gov't Emps. Ins. Co., 421 N.J. Super. 214, 218 (App. Div. 2011) (citing Longobardi v. Chubb Ins. Co. of N.J., 121 N.J. 530, 537 (1990)).

"Notwithstanding that premise, the words of an insurance policy should be given their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability." Ibid. More specifically, "[a] policy's language that is 'direct and ordinary' is not ambiguous when it can 'be understood without employing subtle or legalistic distinctions,' is not 'obscured by fine print,' and does not 'require[] strenuous study to comprehend.'" Mac Prop. Grp. LLC & The Cake Boutique LLC v. Selective Fire and Cas. Ins. Co., 473 N.J. Super. 1, 17 (App. Div. 2022) (quoting Zacarias v. Allstate Ins. Co., 168 N.J. 590, 601 (2001)).

"[W]hen the provision at issue is subject to more than one reasonable interpretation, it is ambiguous, and the 'court may look to extrinsic evidence as an aid to interpretation.'" Cypress Point Condo Ass'n, 226 N.J. at 415-16 (quoting Templo Fuente de Vida Corp., 224 N.J. at 200). However, "when considering ambiguities and construing a policy, courts cannot 'write for the insured a better policy of insurance than the one purchased.'" Flomerfelt v. Cardiello, 202 N.J. 432, 441 (2010) (quoting Walker Rogge Inc. v. Chelsea Title & Guar. Co., 116 N.J. 517, 529 (1989)). Although "the insured has the burden 'to bring the claim within the basic terms of the policy,'" S.T. Hudson Eng'rs, Inc. v. Pa. Nat'l Mut. Cas. Co., 388 N.J. Super. 592, 602 (App. Div. 2006)

14

(quoting <u>Reliance Ins. Co. v. Armstrong World Indus., Inc.</u>, 292 N.J. Super. 365, 377 (App. Div. 1996)), if the clause is exclusionary, "the burden is on the insurer to bring the case within the exclusion," <u>Gibson v. Callaghan</u>, 158 N.J. 662, 671 (1999).

## C.

Against the backdrop of these guiding legal principles, we first consider plaintiffs' argument that the trial court erred in failing to recognize the ambiguity of the term "customarily occupied" and refusing to construe the language in favor of plaintiffs as the insureds. Having considered the record in the light most favorable to plaintiffs, and assessing the plain meaning of the policy's language, we conclude the trial court reasonably found the language was unambiguous, the policy's occupancy condition and coverage exclusion applied, and coverage was properly denied.

The trial court consulted the policy's language as a whole, the specific verbiage of the exclusionary clause, the Black's Law Dictionary definition of "customarily," and this court's prior definition of that term, <u>see</u> <u>Thompson v. Potenza</u>, 364 N.J. Super. 462, 469 (App. Div. 2003) (citing Black's Law Dictionary (6th ed. 1990)), to conclude the term "customarily" was unambiguous. As the trial court correctly observed, "The word 'customarily'

15

means 'usually, habitually, according to custom; general practice or usual order of things; regularly.'" Ibid. (citing Black's Law Dictionary (6th ed. 1990)). In Thompson, we applied the definition contained in Black's Law Dictionary to an automobile insurance contract, noting, "The [p]laintiffs' reliance on the single statement of [the defendant] that [a van] 'could have been' used once a week does not rise to the level of establishing a 'usual' or 'habitual' commercial use and the van remain[ed] a personal vehicle." Ibid.; see also Charlie Brown of Chatham, Inc. v. Bd. of Adjustment, 202 N.J. Super. 312, 324 (App. Div. 1985) (defining "customarily" in the context of zoning regulations as "commonly, habitually, and by long practice").

Here, the trial court similarly afforded the term its plain meaning to modify the word "occupied." It found the plain meaning of the phrase "customarily occupied" required plaintiffs to have actually taken up residence in the home at the time of the loss.

For well over a century, "[we have not been] without a construction of the words occupied and unoccupied in this state." Hampton v. Hartford Fire Ins. Co., 65 N.J.L. 265, 266 (E. & A. 1900). Whether a structure is occupied turns on the intended use of the structure. Ibid. "As to a dwelling-house, it being designed for occupancy by human beings, it is occupied when human beings

16

habitually reside in it, and unoccupied when no one lives or dwells in it." Id. at 268; see also Sonneborn v. Mfrs. Ins. Co., 44 N.J.L. 220, 224 (E. & A. 1882) (holding that daily visits by owner "fell far short of what constitutes the occupancy of a dwelling"). Further, as we have noted, "[h]omeowners' policies may, and usually do, require the insured dwelling to be occupied as a place of abode." Ellmex Const. Corp. v. Republic Ins. Co., 202 N.J. Super. 195, 203-04 (App. Div. 1985); see also 34 Appleman on Insurance 2d § 198.05[B][1] (2011) (noting a house is not "occupied when furniture is moved there preparatory to moving in personally").

Given the plain meaning of these common terms, we conclude the court correctly found that to customarily occupy the house meant actually commencing residence and living in it. Such interpretation did not require the residents to be physically present at the time of the loss or necessitate they remain there continuously without interruption, but it did require their regular, habitual use of the property for its intended purpose—to dwell within its walls.

We are not persuaded by plaintiffs' arguments that the phrase "customarily occupied" was too vague, or that we should graft into the clear existing verbiage an additional term requiring that the insured "customarily occupy" the premises within a "reasonable amount of time." Not only would this require our creating

17

a better contract than the one accepted, acknowledged, and executed by plaintiffs, it would require our overlooking the policy's designated time period until occupancy of "0-30 days." Even affording plaintiffs the benefit of this additional time period to commence dwelling in the home, the fire occurred after the thirty-day window to occupy expired, and before plaintiffs ever moved into the premises. Even in these sympathetic circumstances, we may not rewrite the otherwise clear policy to fit the nature of the loss. Plaintiffs' proposed interpretation of the policy stretches beyond the most elastic view of its language.[3]

Having concluded the trial court correctly determined the policy language was plain and unambiguous and required plaintiffs to actually reside in the home, we are also satisfied the court reasonably considered the facts in their most favorable light to plaintiffs and found plaintiffs did not show they customarily occupied the home. Critically, plaintiffs admitted that they never moved in. They instead extended their lease for the alternate rental home into

---

[3] Giving the language its plain meaning, we need not address plaintiffs' assertion that the policy behind the occupancy restriction was simply to ensure the homeowners' policy was not obtained to avoid the higher cost of insuring a rental property. We note, however, the competing strong policy interest in allowing the insurer to properly assess whether or when the premises would be occupied to mitigate the risks otherwise attendant to vacant or unsupervised property.

18

mid-August. They conceded they were residing in that rental property where they ate, slept, and received mail. But for a few boxes, they had not moved their possessions or furniture into the new house, which had no power and was still being refurbished by Garcia. Other than Kushner's occasionally checking on Garcia's progress, plaintiffs spent no time in the home.

We note, as did the trial court, the policy's language expressly clarifying: "it is understood that the covered dwelling is owned and customarily occupied by you and this is a condition of hazard and use that we undertake to insure under this policy." This language was not nebulous, particularly when considered together with the policy's clear "exclusion" under "Losses Not Insured," stating, "We do not provide insurance for a covered dwelling that is not owned and customarily occupied by you." Given these critical policy terms, the court did not err in finding defendant properly rescinded and denied plaintiffs' claim for coverage because it issued the policy based on the understanding that the premises would be customarily occupied and the policy provided no coverage for loss in violation of the central condition. Thus, the court correctly found plaintiffs' breach of contract and bad faith claims against defendant should not proceed to trial.

A-0570-24

Contrary to plaintiffs' arguments, we do not believe this determination risks a bright line rule leaving unprotected all homeowners transitioning into their new homes, regardless of the circumstances. This case, as questions of insurance coverage often do, turns on its individual facts and circumstances. See Westinghouse Elec. Corp. v. Liberty Mut. Ins. Co., 233 N.J. Super. 463 478-79 (App. Div. 1989) (recognizing "coverage questions may be fact sensitive"). Here, plaintiffs' lack of actual residency and extension of their rental agreement for alternative lodging, together with the indefinite construction period and the empty home without electricity or utilities six weeks after closing, demonstrated the home was never customarily occupied, including at the time of the fire, and thus was not a covered premises under the plain terms of the contract. Nothing about our determination on these individual facts would impede coverage for, or place in peril, homeowners seeking to adequately insure and protect their premises based on their own particular needs and circumstances.

We have reviewed the trial court's written decisions granting summary judgment and denying reconsideration and reject plaintiffs' assertion that the court based its decision on an unsupported finding that Kushner made material misrepresentations in the policy application warranting recission of the policy. The decisions clearly reveal the court based its determination solely on its

20

conclusion that plaintiffs "did not customarily occupy the subject property" as the policy required. Thereafter, the court's reconsideration decision removed any arguable doubt, stating the court found the policy "void ab initio and further declare[d] no coverage" based "squarely and solely on the owner-occupancy exclusion, not the material misrepresentations in the application for insurance."

To the extent the court made factual observations or arguable findings regarding plaintiffs' representations in the policy application, we are satisfied they played no role in its decision and, accordingly, need not play any role in ours. As we conclude coverage was correctly denied based exclusively upon plaintiffs' failure to customarily occupy the premises, we do not address the claims concerning misrepresentation.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division